**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| NNN 123 North Wacker, LLC, et al. | Case No. 13-39210 (JBS) |
| Debtors. | (Jointly administered) |

**FINAL BRIEF OF TROY THOMAS**
**IN FURTHER SUPPORT OF THE MOTION TO DISMISS**

Troy Thomas ("Thomas"), as a member of NNN 123 North Wacker, LLC ("TIC 0"), and for his Final Brief in Support of the Motion to Dismiss this bankruptcy proceeding ("Motion"), hereby states as follows:

**PRELIMINARY STATEMENT**

1. As set forth in Thomas' previous briefs, and further articulated herein, the Managing Member of TIC 0 did not have the requisite authority to file for bankruptcy because it failed to obtain the requisite unanimous consent of TIC 0's Members, thereby directly exceeding the contractual authority provided to it under its LLC Agreement.[1] In response, Debtors insist that this Court must ignore the Certificate and Subscription Agreement evidencing the sale to Thomas of membership interests in TIC 0 because, they claim, (1) the Mezzanine Loan

---

[1] Debtors' incessant criticism of Thomas' initial reliance on the "*unsigned, draft* of the TIC 0 LLC Agreement" – the only LLC agreement that he ever received from Debtors' Manager -- is nothing more than a distracting red herring and a waste of the parties and this Court's time to further discuss. (*See, e.g.,* Debtors' Sur-reply, ¶¶ 3, 4, 5, 25.) The Debtors did not disclose the TIC 0 LLC Agreement or the TIC Member LLC Agreement to the Court or their investors until the Debtors' filing on March 22, 2014 – before that, Thomas had no knowledge of such agreements. Thus, his initial reliance on that document is unsurprising. Notwithstanding, for purposes of this Motion only, Thomas has accepted the LLC Agreements that Debtors now proffer as the governing agreements and the Motion relies solely on the provisions of those agreements to establish that this bankruptcy filing was unauthorized.

Documents prohibit such issuance; and (2) the TIC 0 LLC Agreement prohibits such issuance. Debtors' arguments, as set forth below, are premised on a selective and incorrect reading of those documents. Debtors fail to rebut Thomas' demonstration that he holds membership interests in TIC 0 and, as such, his approval (and the approval of every other TIC 0 member) was required before the Managing Member had authority to commence this bankruptcy case. Having admittedly failed to obtain such approval constitutes cause for dismissal under 11 U.S.C. § 1112(b).

2.     Furthermore, even if Debtors' arguments were accepted and Thomas' membership interests in TIC 0 were converted to equity interests in TIC Member, NNN Realty, as Manager of TIC Member, violated the TIC Member LLC Agreement by initiating this bankruptcy proceeding. There is no language in the TIC Member LLC Agreement that would grant a manager carte blanche authority to file bankruptcy for the LLC, particularly in light of the LLC members' opposition to such filing. Moreover, Delaware and the majority of other courts considering issues analogous to the present have ruled that LLC Agreements must contain an express grant of authority to the manager, in order to provide the requisite authority to take extraordinary measures such as filing for bankruptcy of an LLC. Debtors' argument that the members lost their right to vote on the bankruptcy because the Mezzanine Loan was paid off shortly after -- or in many cases before -- the membership interests were sold to investors and, as a result, NNN Realty was completely unrestrained in its decision to file bankruptcy, is neither supported by the LLC Agreement nor the one case Debtors cite.

I.    **TIC 0'S BANKRUPTCY IS INVALID BECAUSE IT WAS FILED WITHOUT THE PROPER AUTHORITY OF ITS MEMBERS UNDER THE TERMS OF THE TIC 0 LLC AGREEMENT.**

3.     Thomas has met his initial burden to establish that he is a Member in TIC 0 and, thus, the provisions of the TIC 0 LLC Agreement should govern. Thomas has submitted to the

Court the investment documents he received at the time of his investment – the Certificate of Limited Liability Company Interest for TIC 0 and the Subscription Agreement he signed for his purchase of 5 units of membership interest in TIC 0. (*See* Exhibits A-3 and A-4 attached hereto).[2] Despite the fact that Debtors are in the best position to have a record of their business transactions in 2005 and beyond, including copies of the relevant subscription agreements and membership certificates, they plead ignorance of the facts underlying the investments and invent technical defects in the documents that Thomas received in exchange for his investment. (*See* Debtors' Sur-reply, at ¶¶ 6, 10-12, 19.) Other than a highly selective reading of loan documents and the LLC agreements, Debtors provide no evidence that would dispute the unambiguous language of the Subscription Agreement and Membership Certificate establishing the issuance of TIC 0 membership interests to Thomas.[3]

4.      Debtors' attempt to persuade this Court to ignore those documents and to convert Thomas' equity (and the equity of the 158 other members who believe they are TIC 0 members) into interests of TIC Member should be rejected. Debtors' argument hinges on an incorrect interpretation of loan documents, a selective reading of the LLC Agreements, and nine years of hypothesized history by an entity that concededly was not involved with the Debtors for the vast majority of the relevant time period.[4] Debtors argue that it was impossible for TIC 0 to have

---

[2]     Thomas previously submitted these documents as exhibits to his Supplemental Declaration in Support of the Reply. (Doc. No. 181, Ex. 1-A and 1-B.) Thomas resubmits them pursuant to this Court's Order to attach all Corporate Governance documents on which Thomas is relying.

[3]     In fact, as recent as April 1, 2014 – while fervently disputing Thomas' ownership interest in TIC 0 before this Court – the acting Manager sent correspondence to the LLC members, including Thomas, addressing the investors as "Members of 123 North Wacker LLC" – i.e. Members of TIC 0; not Members of TIC Member. (*See* Thomas Reply (Doc. No. 181), Ex. D.) Thus, it appears that even NNN Realty, as the self-acclaimed Manager of TIC 0's Managing Member, believes the investors are members of TIC 0.

[4]     While repeatedly disparaging Thomas' interest in the Property as "nominal" and dismissing the written investment documents he received (and to Thomas' knowledge every one of the other 158 investors in TIC 0 received) as having "little probative significance" (*see, e.g.,* Debtors' Sur-Reply at ¶ 7), Debtors concede that its acting Manager has no equity interest in the Property and its speculation as to

issued membership interests to Thomas and other investors, because the structure originally created – months before those interests were sold – granted TIC Member 100% membership interest in TIC 0. However, far from such grant being written in stone, the LLC Agreements contemplated a variety of changes in the ownership structure of TIC 0 after those entities were established. Simply because TIC Member was granted sole membership on Day 1, does not freeze that circumstance in perpetuity, as Debtors suggest.

### A. THE MEZZANINE LOAN DOCUMENTS DID NOT REQUIRE TIC MEMBER'S 100% OWNERSHIP IN TIC 0 AND, IN FACT, CONTEMPLATED ISSUANCE OF TIC 0 MEMBERSHIP INTERESTS TO FUTURE INVESTORS.

5. Debtors premise much of their argument on a cursory and incorrect reading of the Mezzanine Loan Documents, which Debtors claim prohibit the issuance of membership interests of TIC 0 (defined as "Real Estate Owner" in the Mezzanine Loan Documents) while the Mezzanine Loan is outstanding. However, a careful review of the Mezzanine Loan Documents, including the Assignment, Pledge and Security Agreement ("Pledge Agreement"), belies Debtors' argument.

6. Notably, Debtors fail to cite a single provision within the Mezzanine Loan Documents that would prohibit the subsequent issuance of membership interests of TIC 0 to Thomas and other investors. (Debtors' Sur-Reply, ¶¶ 26-28.) The reason is apparent -- there are no such provisions. To the contrary, the Mezzanine Loan Documents specifically envision and provide for assignment and/or subsequent re-issuance of TIC Member's 100% interest in TIC 0.

---

what occurred in 2005 has no probative significance. NNN Realty, acting for Debtors in this proceeding, concedes that it "does not have first-hand knowledge as to why, in 2005, membership certificates were apparently issued by [the duly authorized Manager] in the name of TIC 0" – or, for that matter, any other first-hand knowledge of events that occurred prior to 2011. (*Id.* ¶ 19.) Debtors' arguments rely on self-serving conjecture of what must-have occurred based on a selective reading of hand-picked documents and should be disregarded as wholly unsupported by those documents or personal knowledge. NNN Realty's conjecture cannot trump the written evidence submitted by Thomas that clearly and unambiguously establishes him as a Member of TIC 0.

7. In September 2005, TIC Member agreed in the Pledge Agreement to assign and grant to the Mezzanine Lender a first priority security interest in the "Ownership Interests" as thereafter defined in that Agreement. (See Exhibit A-5 hereto (Pledge Agrmt., Recitals ¶ C.)[5] However, "Ownership Interests" is defined as "collectively, *whether now existing or hereafter arising or acquired*: (a) one hundred percent (100%) of the *current and <u>future</u> interests of <u>all of the members</u>* under the Governing Agreements…." (*Id.*, § 1.1 Definitions, at p.4.) In turn, "Governing Agreements" is defined therein as "the Operating Agreement" and "Articles of Organization" (as each term is defined therein) of "the Real Estate Owner" – i.e. TIC 0; <u>not</u> TIC Member. (*Id.*)[6]

8. In other words, the Debtors, and their duly authorized Manager – as well as the Mezzanine Lender – specifically envisioned and intended to issue to future investors' ownership interests in TIC 0 – not TIC Member.[7] The only restriction was that such interests would be conveyed subject to the lien by the Mezzanine Lender so long as the Mezzanine Loan was outstanding and, as Debtors point out, that restriction was disclosed in the PPM. Thus, by the very terms of the Mezzanine Loan Documents, and consistent with actual events and the uncontroverted investment documents submitted by Thomas, membership interests of TIC 0 –

---

[5] Thomas includes the Pledge Agreement, which was first attached by Debtors' to Mikles' Supplemental Declaration in support of the Sur-Reply (Doc. No. 202-7, Ex. A-5), with the relevant provisions highlighted for ease of the Court's reference.

[6] Specifically, Thomas directs the Court's attention to § 1.1 <u>Definitions</u>, for the defined terms of "Articles of Organization," "Governing Agreements," "Operating Agreement" and "Real Estate Owner" set forth on pp. 2-5 in alphabetical order. (*See* Doc. No. 202-7, Exhibit A-5 (Assignment, Pledge and Security Agreement).)

[7] While the Mezzanine Loan Agreement contains in the Representations and Warranties section an affirmation by TIC Member that "as of the date hereof" (i.e. September 26, 2005), TIC Member "is the sole member of [TIC 0]," there is no provision in the agreement that prohibits the subsequent issuance of TIC 0 membership interests, so long as such interests were conveyed subject to the lien by the Mezzanine Lender. It also is notable that the Mezzanine Loan was reportedly paid off just six months later, and during the sale process of TIC 0 interests to investors. (Debtors' Sur-Reply ¶¶ 20, 27; Ex. A-3.) Thus, the Mezzanine Loan Agreement had no prohibitive effect, whatsoever, on issuance of future interests.

not TIC Member – were contemplated to be sold and were sold. Mr. Thomas is a member of TIC 0.[8] As a TIC 0 Member, the consent of Thomas and every other TIC 0 member (all of whom presumably can be identified through records in Debtors' possession) was required. Having admittedly failed to obtain such consent, the bankruptcy cases must be dismissed.

> B. **THE TIC 0 LLC AGREEMENT DID NOT REQUIRE TIC MEMBER'S 100% OWNERSHIP IN TIC 0 AND, IN FACT, CONTEMPLATED ISSUANCE OF TIC 0 MEMBERSHIP INTERESTS TO FUTURE INVESTORS.**

9.     Contrary to Debtors' arguments, the TIC 0 LLC Agreement specifically contemplates and provides for TIC Member to assign, in whole or in part, its initial 100% membership interest in TIC 0, as well as the admission of new members. Specifically, Section 8.01(a) states, in relevant part, "the Member may assign in whole or in part its Membership Interest in the Company" and Section 8.01(c) states "[o]ne or more additional members of the Company may be admitted to the Company with the written consent of the Member." (Ex. A-1 hereto (TIC 0 Agrmt.) at p.7.) Debtors do not contest that TIC Member was managed by Triple Net Properties, LLC ("Triple Net") in 2005 and, thus, Triple Net was duly acting for TIC Member. (*See* Ex. A-2 hereto (TIC Member Agrmt.) at 1 (identifying in the first paragraph Triple Net "as the Manager" of TIC Member).) Triple Net is the entity that signed the Certificate thereby evidencing the "written consent of the Member" to such assignment of TIC 0 membership interests.[9]

---

[8]     Even if the Mezzanine Loan Documents required TIC Member to retain 100% ownership interest in TIC 0 while the loan was outstanding – which the provisions do not – that would not provide Debtors with standing, or the right, to use such requirement as a sword against their own investors to change the ownership units that the Debtors sold. At most, that would provide the lender with potential recourse against the Debtors, but as Debtors now argue, the Mezzanine Loan has long-since been paid off so such provision no longer controls any part of this proceeding.

[9]     Debtors' attempt to use alleged technical defects in Thomas' investment documents, which were issued by and on behalf of the Debtor entities, as a sword against investors to avoid the clear meaning and

10. Thus, far from "prohibiting" the issuance of TIC 0 interests to members other than TIC Member, the TIC 0 LLC Agreement specifically contemplates and endorses such an assignment and additional members. Debtors' mantra that months prior to Thomas' investment, TIC Member held 100% of the membership interests in TIC 0 is irrelevant. Just because TIC Member held such interests in September 2005 does not lead to the inevitable conclusion that it was required to hold exclusive membership permanently.

11. Debtors concede, as they must, that if Thomas and his fellow investors are members of TIC 0, then § 2.01 of the TIC 0 LLC Agreement controls and required unanimous consent of all TIC 0 Members before the requisite authority was granted to file the bankruptcy petitions. (Debtors' Sur-Reply at ¶ 24.) Specifically, § 2.01 states:

> Notwithstanding any provision of this Agreement to the contrary and so long as any obligation secured by the Loan remains outstanding and not discharged in full, the Member and the Company and any other Person on behalf of the Company <u>shall have no authority, unless such action has been approved by</u> the Independent Manager and <u>the unanimous vote of the Members</u>, to file a voluntary petition or otherwise initiate proceedings to have the Company adjudicated bankrupt or insolvent or consent to the institution of bankruptcy or insolvency proceedings against the Company ….

12. Debtors also concede, as they must, that they did not seek or obtain the permission to file the bankruptcy petition on behalf of TIC 0 from any member other than TIC Member. (*Id.* (acknowledging that the "Loan" referenced in that paragraph is outstanding and conceding that, while unanimous consent of the Members of TIC 0 was required, approval was granted solely by TIC Member).) Thus, under Section 2.01 of the TIC 0 LLC Agreement, there was no authority to file the bankruptcy petition for TIC 0.

---

intent of the investment documents and the obligations created thereby evidences a blatant disregard of fiduciary duties and bad faith conduct toward the investors.

13. It is well settled that lack of authority to commence a bankruptcy case constitutes cause for dismissal under 11 U.S.C. § 1112(b). *See In re Gen-Air Plumbing & Remodeling, Inc.*, 208 B.R. 426, 430 (Bankr. N.D. Ill., 1997) (citing *Price v. Gurney*, 324 U.S. 100, 106, 65 S.Ct. 513, 89 L.Ed. 776 (1945)); *In re Orchard at Hansen Park, LLC*, 347 B.R. 822, (Bankr. N.D. Tex. 2006) (finding that the Chapter 11 petition that one member of a LLC had unilaterally filed on the LLC's behalf, contrary to provision in the operating agreement that precluded members of LLC from filing bankruptcy petition on its behalf without unanimous consent of all of its members, had to be dismissed); *In re Carolina Park Associates, LLC*, 430 B.R. 744 (Bankr. D. S.C. 2010) (finding that the second member of two-member LLC did not "consent" to filing of Chapter 11 petition on LLC's behalf, as required under the LLC's operating agreement in order for other member to have authority to file petition, merely by executing release in which it agreed not to contest validity of bankruptcy petition filed by this other member); *In re Eastern Bancorp.*, 23 B.R. 474, 476 (Bankr. PA., 1982) ("It is a fundamental principle of law that those who act to put a corporation into bankruptcy must have the authority to do so.").

14. Furthermore, "[w]herever a court 'finds that those who purport to act on behalf of the corporation have not been granted authority by local law to institute proceedings, it has no alternative but to dismiss the petition.'" *In re Comscape Telecomm'ns, Inc.*, 423 B.R. 816, 830 (Bankr. S.D. Ohio, 2010) (citing *Price v. Gurney*, 324 U.S. at 106); *see also In re Southern Elegant Homes, Inc.*, 2009 WL 1639745, *1 (Bankr. E.D.N.C. June 9, 2009) (dismissing unauthorized petition without relying on § 1112(b)); *In re N2N Commerce, Inc.*, 405 B.R. 34, 41 (Bankr. D.Mass. 2009) (same); *In re Telluride Income Growth Ltd. P'ship*, 311 B.R. 585, 591 (Bankr. D.Colo. 2004) (same); *Kelly v. Elgin's Paint & Body Shop, Inc. (In re Elgin's Paint &*

*Body Shop, Inc.)*, 249 B.R. 110, 112 (Bankr. D.S.C. 2000) (same). As a result of failing to first obtain the requisite authority to commence this proceeding, the cases must be dismissed.

## II. DEBTORS ALSO LACKED AUTHORITY TO COMMENCE THIS BANKRUPTCY PROCEEDING UNDER ESTABLISHED CASE LAW.

15. Starting from the faulty premise that the investors' membership interests in TIC 0 necessarily must be converted to interests in TIC Member, Debtors insist that their authority to file bankruptcy "derives from the TLC Member LLC Agreement," and then pick and choose which sections of the TLC Member LLC Agreement to rely upon. (*See* Debtor's Sur-reply, p. 8 at ¶ 20.) However, if the Court is to accept that Thomas is in fact a member of TIC Member and not TIC 0, notwithstanding the PPM, the Membership Certificate and the Subscription Agreement, the Court still must conclude that NNN Realty did not have authority to file these bankruptcy cases under the TIC Member LLC Agreement, and the cases must be dismissed.

16. In order to determine whether a debtor has authority to file, bankruptcy courts initially look to the state law governing the entity. *See Price v. Gurney*, 324 U.S. at 106. Here, the Debtors are each a limited liability company organized and governed by Delaware state law. Under the Delaware Limited Liability Company Act (the "LLC Act"), a LLC's operating agreement specifies the rights and duties of its members and managers, and the actions of a manager or managing member are limited by the express provisions of the agreement. *See, e.g.*, 6 Del. C. §§ 18–215, 18–302, 18-402.

17. The LLC Act is silent as to a manager's specific authority to file a bankruptcy petition for a LLC. However, the Court in *Milford Power Co., LLC v. PDC Milford Power, LLC*, 866 A.2d 738, 754 (Del. Super. 2004) found that Section 18–304 of the LLC Act, "represents a default rule of Delaware public policy that expresses the view that, absent a contractual provision to the contrary, members of a Delaware LLC need not fear that they will have as fellow members

bankruptcy trustees or assigns of bankruptcy trustees. That is, § 18–304 expressly recognizes the unique relationships that exist among members of LLCs and protects solvent members from being forced into relationships they did not choose that result from the bankruptcy of one of their chosen co-investors." Following this principle suggests that the Delaware LLC Act does not take the decision to file bankruptcy lightly, and that the authority to file bankruptcy should not be a default power awarded to a manager of an LLC absent specific contractual language entrusting such a right to him.

18. Notwithstanding, Debtors maintain that a unanimous vote of the "Members" of TIC Member was not necessary because the "Mezzanine Loan" has been paid in full. (*See* Debtors' Sur-reply, p. 9 at ¶ 10.) As an initial matter, the TIC Member LLC Agreement defines "Mezzanine Loan" to include, "…any future Mezzanine Loan made from time to time to one or more of the Company and the other owners (whether direct or indirect) of the Property, used in connection with or for the benefit of the Property, *including without limitation refinancing any debt secured by the Property*." (*See* Ex. A-2 (TIC Member LLC Agrmt.) at p. A-5.) Thus, there is a significant but unanswered question of whether existing financing was used to pay off the Mezzanine Loan, in which case such refinancing could fall within the definition of Mezzanine Loan. Again, Debtors have exclusive possession of documents that could answer this question, but fail to address how the Mezzanine Loan reportedly was paid off in March 2006.

19. However, the Court need not reach that issue to conclude that NNN Realty still lacked authority to file these bankruptcy cases. In their Opposition, Debtors rely on Section 7.3.20 of the TIC Member LLC Agreement to give NNN Realty the power to authorize the filing of Debtors' bankruptcy cases. Section 7.3.20 provides that TIC Member's manager, may "[i]nitiate legal actions, settle legal actions and defend legal actions on behalf of the Company."

Now, in their Sur-Reply, Debtors rely on Section 7.1 to support their argument that NNN Realty has the unfettered right to authorize these bankruptcy filings, without any notice or vote from the "Members." Section 7.1, however, states only that TIC Member's manager has "full and complete authority to manage and control the business, affairs, and all property of [TIC Member]." That section makes no mention of the specific right of the manager to unilaterally authorize extraordinary matters outside the normal course of business, such as the LLC's bankruptcy filing.

20. Many courts have come to the opposite conclusion, finding that the filing of a bankruptcy petition by the manager of an LLC that is not specifically and expressly authorized in the operating agreement is not valid and falls outside the scope of normal business activities. *See Green Bridge Capital S.A. v. Ira Shapiro* (*In re FKF Madison Park Group Owner, LLC*), 2011 WL 350306, *3 (Bankr. D.Del., 2011) (finding that "placing an entity into bankruptcy clearly exceeds ordinary business activities," and as such, filing of bankruptcy by manager was not valid); *In re Avalon Hotel Partners, LLC*, 302 B.R. 377, 42 Bankr. Ct. Dec. (CRR) 77 (Bankr. D. Or. 2003) (finding that a manager resolution was not effective to authorize the filing of the Chapter 11 petition on behalf of the LLC under either Oregon law or the company's operating agreement, since conversion of the LLC into a debtor in possession was a major decision, outside of the ordinary course of business, made without the consent of a majority of the members); *In re H&W Food Mart, LLC,* 461 B.R. 904, 907 (Bank. N.D.Ga., 2011) (dismissing a bankruptcy case where manager did not have the approval of a majority in interest of the members of the LLC to file for bankruptcy protection). A decision to file for bankruptcy protection is a decision outside the ordinary course of business, and the Court should not expand the powers given to the "Manager" under the TIC Member LLC Agreement by reading into a grant of authority to handle

- 11 -

day to day operations, the extraordinary power to unilaterally file bankruptcy without the consent of the Members that bargained for a vote in the decision.  (*See* A-2 (TIC Member LLC Agrmt.) at § 7.1; *see also* Thomas Suppl. Decl. (Doc. No. 185), p. 2 at ¶ 4 (stating that the inclusion of language conditioning a bankruptcy filing on the vote of the members was particularly significant to the investor because the manager would not be an investor in the property and would have different economic interests than the members).)

21.     Likewise, in cases where members have specifically contracted in the operating agreement to restrict a manager's authority to file for bankruptcy, courts have found that bankruptcy filings are outside the scope of the manager's authorized duties in the operating agreement. *See In re DB Capital Holdings, LLC*, No. 10-046, 2010 WL 4925811,* 2 (10th Cir. B.A.P. Dec. 6, 2010) (rejecting manager's argument that express anti-bankruptcy provisions in the LLC operating agreement are void as a matter of public policy and concluding that even if it disregarded the express prohibition against a bankruptcy filing, such a filing on behalf of the LLC was outside the scope of the manager's authorized duties to manage and control the entity set forth in the operating agreement); *In re Cabernet Holdings LLC*, No. 10–50602C–11W, 2010 WL 2540116, * 2 (Bankr. M.D. N.C. June 21, 2010) (finding that the bankruptcy filing was "beyond day to day management" and, because it was filed by a single manager where the LLC operating agreement explicitly requires both members consent, was unauthorized under the operating agreement and state law); *In re Avalon Hotel Partners, LLC,* 302 B.R. 377, 380-81 (Bankr. D. Or. 2003) (finding that the decision of the manager to file a chapter 11 petition converted the LLC into a debtor in possession, which the court concluded was a change in entity structure which required the consent of a majority of the members).

22. Here, the only provision that addresses the Manager's authority to take the extraordinary action of filing for bankruptcy required the unanimous consent of all Members – this was a provision that was included in both the TIC Member LLC Agreement and the TIC 0 LLC Agreement. (*See* Ex. A-2 (TIC Member LLC Agrmt.), § 7.4.16; Ex. A-1 (TIC 0 LLC Agrmt), § 2.01(b).) Thus, to disregard the expressed intent to limit the Manager's authority to take the extraordinary action of filing for bankruptcy and read into the agreement unfettered authority to do so – not only in the absence of Member consent but in disregard of the Members' expressed opposition – is not consistent with either the letter or the spirit of the LLC Agreements or the Delaware LLC Act.

23. In support of their position, the Debtors can point to only one case from the Eastern District of New York interpreting a two member New York LLC agreement under New York state law. (*See* Debtors' Sur-reply, p. 10, at ¶ 22 (citing *In re East End Development, LLC* ("East End"), 491 B.R. 633, 2013 WL 1820182 (Bankr. E.D.N.Y., 2013)).) This case is inapposite to the facts here. Unlike the operating agreement analyzed in *East End*, the TIC Member LLC Agreement contains a provision directly restricting the filing of a bankruptcy by the LLC, as well as other specific limitations on the manager's authority. (TIC Member LLC Agrmt., § 7.4.) The LLC agreement in *East End* was entirely silent as to whether the manager member had such authority without the consent of the other member and contained virtually no limitations on the Manager's authority. 491 B.R. at 639. Debtors argue that the provision restricting their authority should be ignored because the Mezzanine Loan was repaid. However, it is entirely unclear whether existing financing falling within the definition of "Mezzanine Loan" still exists or with what funds that loan was repaid. (TIC Member LLC Agrmt. at p. A-5.) Regardless, Thomas submits that this provision, read within the context of other limiting

provisions on the Manager's authority, demonstrated an intent to require unanimous member approval before such an extraordinary, out-of-the-normal-course-of-business measure as a bankruptcy filing would be commenced – particularly given the lack of equity interest of the Manager in the Property.

24. There are other material facts that further distinguish the operating agreement and underlying facts in *East End* from the present case. First, the debtor in *East End* already had defaulted under the loan obligations, a foreclosure action had been commenced after which eight months of unsuccessful negotiations had ensued, and, notably, the managing member had notified the other LLC member by letter of its intent to file for bankruptcy more than six months before filing. 491 B.R. at 636. None of those key events occurred here prior to NNN Realty commencing these proceedings. Moreover, the managing member held a meeting of the managers of the Debtor prior to filing for bankruptcy at which a vote was taken. In stark contrast, NNN Realty swooped in to take exclusive control of the negotiations with the lenders and the Property, with no prior notice, no prior meeting of its members or the other TICs, and against the overwhelming opposition from its own LLC members. Second, the LLC agreement in *East End* contained a grant of broad authority to the Manager to conduct matters outside the ordinary course of business, including but not limited to a sale of all or any part of the assets of the debtor. Here, under the TIC Member LLC Agreement, the Manager's authority to "sell, lease or dispose of substantially all the assets of the Company" is expressly restricted and expressly requires the vote of the TIC Member members. (TIC Member LLC Agrmt. at § 7.4.13; § 8.2.5.) Besides involving New York state law, which is inapplicable to the present case, the controlling facts in *East End* are distinguishable from those here.

25. Under the LLC Act, parties are allowed freedom to contract regarding the rights and limitations of a manager's powers. Here, the TIC Member LLC Agreement was drafted to specifically prohibit the manager's filing of a bankruptcy petition for the LLC without a unanimous vote in favor of such action by the LLC's members and otherwise provided no specific authority for the manager to take an action so far removed from ordinary business activities without member approval. For the Court to ignore this language would be in contradiction to both applicable bankruptcy case law and the spirit of the LLC Act. In violation of the TIC Member LLC Agreement and the TIC 0 LLC Agreement, the Debtors did not take a vote on the decision to file bankruptcy, instead relying upon the unilateral and unconstrained consent of NNN Realty. Accordingly, the Debtors did not have the proper authority to file the bankruptcy cases and they must be dismissed.

## IV. CONCLUSION

For the reasons set forth above, and in Thomas's Motion to Dismiss and Reply, Thomas respectfully requests the entry of an order dismissing the Debtors' Bankruptcy Cases, and granting such other and further relief as justice requires.

Dated: April 30, 2014            Respectfully Submitted,

                                                   **TROY THOMAS**

                                                   By: /s/ Theresa L. Davis
                                                         One of His Attorneys

                                                   Stephen T. Bobo
                                                   Theresa L. Davis
                                                   REED SMITH LLP
                                                   10 South Wacker Drive, 40th Floor
                                                   Chicago, IL 60606-7507
                                                   Telephone: (312) 207-2777
                                                   Email: sbobo@reedsmith.com
                                                                  tdavis@reedsmith.com

                                                   *Counsel for Troy Thomas*